# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| JOSHUA D. RUPE, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 20-4011-CV-C-SRB-P ) |
| MARILYN RUSSEL, et al., | ) ) |
| Defendants. | ) ) |

## ORDER GRANTING DEFENDANTS' MOTIONS FOR
## SUMMARY JUDGMENT AND DISMISSING CASE

Plaintiff, who is confined at the Boonville Correctional Center in Boonville, Missouri, has filed this civil rights action pursuant to 42 U.S.C. § 1983, seeking relief for certain claimed violations of his federally protected rights. Currently pending before this Court are Defendants' motion for summary judgment (Doc. 57), Plaintiff's response in opposition (Doc. 60), and Defendants' reply thereto (Doc. 61). For the reasons set forth below, Defendants' motion for summary judgment is granted.

**I. Standard**

Pursuant to Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment on a claim only if he has made a showing that "there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law." *See generally Van Wyhe v. Reisch*, 581 F.3d 639, 648 (8th Cir. 2009); *Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 884-85 (8th Cir. 2009). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Recio v. Creighton Univ.*, 521 F.3d 934, 938 (8th Cir. 2008) (citation omitted).

The inquiry performed is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "The nonmoving party must show the existence of facts on the record which create a genuine issue." *Larson v. Kempker*, 414 F.3d 936, 939 (8th Cir. 2005) (citing *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). An "adverse party may not rely merely on allegations or denials, but must set out specific facts – by affidavits or other evidence – showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (citing Fed. R. Civ. P. 56(e)).

**II. Background**

*A. Procedural History*

Plaintiff names the following defendants in his amended complaint: (1) Corizon Health Administrator Marilyn Russell; (2) Medical Director Arthur Keiper; and (3) Medical Director T. Bredeman. Doc. 19, pp. 1-2. Plaintiff brings suit against Defendants only in their official capacities. *Id.* at 1, 5. Defendants are each employed by Corizon Health, Inc. ("Corizon"). Doc. 58, p. 7.

Plaintiff alleges that Defendants have failed "to adequately recognize and treat" his Hepatitis C viral infection ("HCV"), from which he has suffered since 2002. Doc. 19, p. 5. Plaintiff alleges that he was told about a "proper Rx/ cure" in January/February 2014, but that, pursuant to unconstitutional customs and/or policies, Defendants have allowed Plaintiff "to be in occasional stomach pain and great discomfort mentally and/or physically for the past 7 years while he has been waiting" for this "newer/safer treatment." *Id*. at 5-7. Accordingly, Plaintiff alleges that Defendants have violated his rights under the Eighth Amendment to the United States Constitution by remaining deliberately indifferent to his serious medical needs. *Id*. at 5-6. Plaintiff's requests $750,000.00 in money damages and that Corizon be ordered to treat his HCV "with proper Rx/ Cure." *Id*. at 3, 27.

This case was previously stayed pending the resolution of the class claims in *Postawko, et al. v. Mo. Dept. of Corr., et al.*, No. 16-CV-4219-NKL-P (W.D. Mo.), wherein a class of Missouri inmates

brought suit against Corizon, the Missouri Department of Corrections ("MDOC"), and various employees thereof due to an alleged failure to provide proper treatment for inmates diagnosed with HCV. Doc. 28, *see also Postawko*, No. 16-CV-4219-NKL-P, Docs. 30, 174. On October 28, 2020, the *Postawko* Court entered an order approving a settlement agreement. *Postawko*, No. 16-CV-4219-NKL-P, Doc. 571. The settlement agreement provides a detailed procedure for treatment of class members with direct acting antiviral drugs ("DAAs"). *Postawko*, Doc. No. 565, p. 5, Doc. No. 565-1, pp. 5-6. Following the settlement in *Postawko*, the stay in this case was lifted, and Plaintiff's claims for injunctive relief were severed and dismissed from this case after this Court found that such claims were barred by the judgment in *Postawko*. Docs. 34, 41.

### *B. HCV*

HCV is a blood-borne infectious disease caused by the hepatitis C virus. Doc. 58, p. 9. HCV may constitute a short-term illness, and a majority of people infected with HCV will not develop liver damage. *Id*. In some cases, however, HCV may progress to fibrosis or cirrhosis over the course of years or decades. *Id*. The World Health Organization ("WHO") reports that 55-85% of infected persons develop chronic HCV infection and that, of those with chronic HCV infection, "the risk of cirrhosis ranges between 15% and 30% within 20 years." Doc. 60-1, p. 14. The Center for Disease Control ("CDC") similarly estimates that of every 100 people infected with HCV, approximately 5-25 will develop cirrhosis within 10-20 years. *Id*. at 3. According to WHO, "antiviral medicines can cure more than 95% of persons with hepatitis C infection." *Id.* at 13. Therefore, WHO recommends treating all persons with chronic HCV infection over the age of 12 with DAAs. *Id*. at 16.

### *C. Corizon's Policy*

Under the management of Dr. Jerry Lovelace, Corizon's Regional Medical Director for the State of Missouri, Corizon maintains policies and procedures for the monitoring and treatment of offenders with HCV in the custody of the MDOC. Doc. 58, p. 9. These policies, identified as "Pathways," include the

following: (a) Initial HCV Chronic Care Clinic; (b) Follow-up HCV Chronic Care Clinic; (c) Hepatitis C: Nurse Chronic Care Protocol; (d) Cirrhosis Pathway; and (e) Hepatitis C Treatment Pathway. *Id*. at 9-10.

Once an offender tests positive for HCV, he or she receives a baseline history and physical examination, lab tests, a calculation of their APRI score,[1] a FibroSure score,[2] an assessment of the need for preventative health interventions like vaccines and screenings for other conditions, and counseling on information related to HCV infection. *Id*. at 10. Following the initial evaluation, medical personnel utilize the HCV Chronic Care Clinic Pathway to prioritize offenders with HCV into three priority levels. *Id*. Priority 1 includes individuals with advanced hepatic fibrosis/cirrhosis, liver transplant recipients, hepatocellular carcinoma, comorbid hepatitis C conditions, immunosuppressant medication, individuals already on treatment, and/or individuals with a FibroSure of F3 or F4. *Id*. Priority 2 includes individuals with co-infections of HIV or hepatitis B, an APRI score greater than or equal to 0.7-1.99 or a Fib-4 score of 1.45-3.25, FibroSure of F2, individuals with diabetes mellitus, comorbid liver diseases, chronic kidney disease with GFR less than or equal to 59, and/or those born between 1945 and 1965. *Id*. Priority 3 includes individuals with an APRI score of less than 0.7 or a Fib-4 score less than 1.45 and a FibroSure of F0 or F1. *Id*. Offenders prioritized as Priority 1 receive additional labs and imaging studies for further prioritization and assessment for administration of DAA medication. *Id*. Offenders prioritized and assessed as Priority 2 and 3 receive assessments for DAA medication and receive treatment and monitoring through the Chronic Care Clinic every six or twelve months based on identified risk factors and lab results. *Id*. at 10-11.

The given justification for the above prioritization is to ensure "that those offenders experiencing more severe complications or more significant viral progression begin the DAA medication regimen

---

[1] An APRI score is calculated "utilizing several different lab values which can be obtained through routine blood draws." It is used as a baseline clinical measurement of the level of a patient's fibrosis. Doc. 58-1, p. 4.

[2] FibroSure is a biomarker test that uses the results of six blood serum tests to generate a score that is correlated to measure level of fibrosis of an individual's liver. Doc. 58-1, p. 4.

4

before others whose disease may not be progressing." *Id*. at 11. Offenders assessed and identified for DAA medication receive further assessment by the HCV Advisory Group for recommendation of specific DAA medication, specific to the offender's presentation. *Id*.

### D. Plaintiff's HCV Treatment

Plaintiff entered MDOC custody in 2012, at which time his prior HCV diagnosis was confirmed and Plaintiff was enrolled in the Chronic Care Clinic to monitor and treat his HCV. *Id*. Since 2012, Plaintiff did not submit to Corizon any requests to be seen by medical due to any distress related to his HCV infections. *Id*. Nevertheless, Plaintiff vocalized complaints of "a sharp pain once in a while" and concerns of possible liver damage at appointments in 2013. Doc. 60, p. 2; Doc. 60-1, pp. 27-29. Plaintiff wrote a letter to the "Medical Classification Division" on February 12, 2018, asking for "new advanced treatment" out of concerns that he had liver damage. Doc. 60-1, p. 30. In response, Plaintiff was told that he would continue to be evaluated for treatment based on his laboratory blood results and other factors "to be explained by [his] doctor." Doc. 60-1, p. 31. Plaintiff alleges that he raised additional complaints and concerns that "were not recorded during each of Plaintiff's annual monitoring appointments." Doc. 60, p. 5.

On February 1, 2019, Plaintiff filed a medical grievance seeking DAA medication. Doc. 19, p. 16. The grievance did not claim that Plaintiff suffered from pain, discomfort, or distress related to his HCV infection. *Id*. In response to Plaintiff's grievance, Plaintiff was informed that Corizon had initiated DAA treatment for Priority 1 offenders, and, upon completion, would begin providing DAA treatment to Priority 2 and then Priority 3. *Id*. at 15. Plaintiff was further informed that he would continue to be monitored and evaluated through the Chronic Care Clinic and that his priority level would be updated if his health needs changed. *Id*.

On November 18, 2020, Plaintiff attended a Chronic Care appointment, where he "indicated no recurring pain, no jaundice, no lethargy or fatigue, no disorientation, no peripheral edema, no chronic nausea and vomiting, and no easy bruising." Doc. 58-1, p. 7. Upon examination, Plaintiff "showed no

5

signs of distress, pain or discomfort associated with his HCV," and "presented with no jaundice, no petechiae, no ascities [sic], no abnormal abdominal exam, and no lower extremity edema." *Id*. During that examination, medical staff informed Plaintiff that he had an APRI score of 0.25, a Fib-4 score of 0.70, and that, based on his labs and examination, his overall condition indicated little to no progression and that he remained a Priority 3 pursuant to the existing policy. Doc. 58, p. 12. On May 18, 2021, Plaintiff received further lab reports indicating that he had an APRI Score of 0.303 and a Fib-4 score of 0.76. Doc. 60-1, p. 26.

### III. Discussion

In support of their motion for summary judgment, Defendants argue that they were not deliberately indifferent to Plaintiff's HCV and that Plaintiff fails to show any detrimental effect form the alleged delay in treatment of his HCV. Doc. 58, pp. 12-19. In response, Plaintiff argues, *inter alia*, that he complained regularly about his discomfort and concerns about liver damage, was eligible for HCV medication in 2013 "because of [his] complaints," his "ALT levels" have registered as high as far back as 2007, and he faces a statistically increased chance of suffering from liver damage the longer his HCV goes untreated with DAA medication. Doc. 60, p. 5.

Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id*. at 166; *King v. City of Crestwood*, 899 F.3d 643, 650 (8th Cir. 2018) ("a suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity"). "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Gladden v. Richbourg,* 759 F.3d 960, 968 (8th Cir. 2014) (quoting *Grayson v. Ross,* 454 F.3d 802, 810–11 (8th Cir. 2006)).

6

"Deliberate indifference to the serious medical needs of a prisoner constitutes cruel and unusual punishment . . . and the Constitution prohibits state governments from inflicting such punishments." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976)). In order to prevail on a deliberate indifference claim, Plaintiff must prove: (1) that he suffered from an objectively serious medical need; and (2) that prison officials knew of the need but deliberately disregarded it. *Johnson v. Hamilton*, 452 F.3d 967, 972-73 (8th Cir. 2006) (citing *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). "For a claim of deliberate indifference, 'the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008)) (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). "An inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs." *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997).

Plaintiff fails to establish that a genuine issue of fact remains as to whether Defendants remained deliberately indifferent to his medical needs in their official capacities under the foregoing standard. Plaintiff fails to present sufficient evidence indicating that the three-level prioritization policy utilized by Corizon constitutes deliberate indifference to his HCV infection. It is uncontroverted that Plaintiff's treatment is consistent with the settlement agreement in *Postawko*, which the district court found fell "within the range of fairness, reasonableness, and adequacy so as to warrant the Court's final approval." *Postawko*, No. 16-CV-4219-NKL-P, Docs. 565, 571, p. 1.[3] Without more, such a scheme satisfies constitutional requirements. *See Hoffer v. Secretary, Fla. Dep't Corr.*, 973 F.3d 1263, 1266 (11th Cir. 2020) ("We hold . . . that the officials' current treatment plan—pursuant to which they monitor all HCV-positive inmates, including those who have yet to exhibit serious symptoms, and provide DAAs to anyone

---

[3] The approved agreement provides for, *inter alia*, DAA treatment based on a three-level prioritization scheme, as defined by the Federal Bureau of Prisons Guidance. *Postawko*, No. 16-CV-4219-NKL-P, Doc. 565-1, pp. 6-7, Doc. 571.

who has an exacerbating condition, shows signs of rapid progression, or develops even moderate fibrosis—satisfies constitutional requirements.").

Plaintiff also fails to identify sufficient verifying medical evidence in the record to establish that he has experienced a detrimental effect due to the alleged delay in medical treatment. *See Coleman*, 114 F.3d at 784; *Jackson v. Riebold*, 815 F.3d 1114, 1120 (8th Cir. 2016) (affirming summary judgment when Plaintiff failed to produce evidence of the detrimental effect of delayed treatment). Although Plaintiff presents articles from the CDC and WHO indicating that a percentage of individuals with chronic HCV infection develop cirrhosis within twenty years, Plaintiff does not present verifying medical evidence that the alleged delay has resulted in that risk being realized in his case. Rather, Plaintiff does not dispute that he receives regular monitoring and examination through the Chronic Care Clinic to assess his priority level, which will be updated if clinically indicated. Doc. 19, p. 15; Doc. 58, p. 12; Doc. 60-1, p. 26. Although Plaintiff takes issue with the nature of the monitoring and examinations provided, Plaintiff fails sufficiently to present evidence indicating that the denial of additional diagnostic techniques or treatment by Defendants, including "MRI imaging" (Doc. 60, p. 5), amounts to a violation of Plaintiff's constitutional rights. *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment").

Ultimately, Plaintiff allegations, including his claims that the monitoring he receives is insufficient to identify his potential liver damage or that the policy that dictates his treatment should have lower thresholds for providing DAA medication, at most, amount to claims of negligence, medical malpractice, or mere disagreement with treatment decisions, which do not establish § 1983 liability. *See Popoalii*, 512 F.3d at 499. Consequently, Defendants are entitled to summary judgment.

8

## IV. Conclusion and Notice of Appellate Filing Fee

For the reasons explained above, and having considered Plaintiff's ancillary evidence, arguments, and claims, the Court finds that this case presents no unresolved issue of material fact and that Defendants are entitled to judgment as a matter of law. Therefore, this Court will grant Defendants' motion for summary judgment.

Plaintiff is advised that if he appeals this dismissal, in addition to the $350.00 filing fee in this case, federal law "'makes prisoners responsible for [appellate filing fees of $505.00] the moment the prisoner . . . files an appeal.'" *Henderson v. Norris*, 129 F.3d 481, 483 (8th Cir. 1997) (citation omitted). Pursuant to *Henderson*, Plaintiff is notified as follows:

> (a) the filing of a notice of appeal by the prisoner makes the prisoner liable for payment of the full [$505] appellate filing fees regardless of the outcome of the appeal; (b) by filing a notice of appeal the prisoner consents to the deduction of the initial partial filing fee and the remaining installments from the prisoner's prison account by prison officials; (c) the prisoner must submit to the clerk of the district court a certified copy of the prisoner's prison account for the last six months within 30 days of filing the notice of appeal; and (d) failure to file the prison account information will result in the assessment of an initial appellate partial fee of $35 or such other amount that is reasonable, based on whatever information the court has about the prisoner's finances.

*Id.* at 484.

Accordingly, it is **ORDERED** that:

(1) Defendants' motion for summary judgment (Doc. 57) is granted; and

(2) this case is dismissed.

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: August 16, 2021 .